IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | Civil Action No. 3:12-CV-491-J-34 TEM |
| Plaintiff, | COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| JACKSONVILLE ASSOCIATION OF FIREFIGHTERS, LOCAL 122, INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, | |
| Defendant. | |

FILED 2012 APR 30 AM 11:18 CLERK, US DISTRICT COURT MIDDLE DISTRICT OF FL JACKSONVILLE FLORIDA

## NATURE OF ACTION

This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* ("Title VII"), and Title I of the Civil Rights Act of 1991, 42 U.S.C. §1981a, against the Defendant, Jacksonville Association of Firefighters, Local 122, International Association of Firefighters (the "Union"), for damages and other appropriate relief based on the Union's advocacy for and negotiation in favor of an unlawful promotional process which has been utilized by the Consolidated City of Jacksonville (the "City"), for promotions in its Fire and Rescue Department ("JFRD") since at least 2004.

As is more fully set forth below, the United States Equal Employment Opportunity Commission ("Commission" or "EEOC") alleges that the Union has violated Title VII by advocating for and negotiating in favor of a promotional process for selecting candidates for promotion in the JFRD to the ranks of Engineer, Lieutenant (Suppression), Captain

(Suppression), and District Chief (Suppression), which has resulted in a disparate impact on black candidates, is not job related for the position in question and not consistent with business necessity for the position in question, and does not otherwise meet the requirements of Title VII.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to (i) Sections 703(c)(3) of Title VII, 42 U.S.C. § 2000e-2; (ii) Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3); (iii) Section 707 of Title VII, 42 U.S.C. § 2000e-6; and (iv) Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful herein were committed within the jurisdiction of the United States District Court for the Middle District of Florida.

## PARTIES

3. The Commission is an Agency of the United States of America charged with the administration, interpretation and enforcement of Title VII, and is expressly authorized to bring this action by Section 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3), and Section 707 of Title VII, 42 U.S.C. § 2000e-6.

4. The Union is the sole collective bargaining representative for firefighters employed by the City. At all relevant times, the Union has continuously been an association of participating employees which deals with the City concerning the terms and conditions of employment, and has continuously had at least 15 members.

5. At all relevant times, the Union has continuously been a labor organization engaged in an industry affecting commerce within the meaning of Sections 701(d) and (e) of Title VII, 42 U.S.C. §§ 2000e(d) and (e).

## ADMINISTRATIVE PROCEEDINGS

6. Commissioner Stuart J. Ishimaru filed a charge of discrimination against the Union on February 7, 2008. The charge of discrimination alleged violations of Title VII by the Union. All conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF FACTS

I. **HISTORICAL FACTS**

   A. *The Coffey Litigation*

7. In 1971, a group of black firefighter applicants filed a class action lawsuit against the City alleging race discrimination with respect to the hiring of black firefighters (*Coffey v. Brady*, Case No. 09-mc-00022). Thereafter, on August 12, 1971, the *Coffey* Court approved and ordered a stipulated consent decree between the parties, which required the City to "take whatever action is necessary to hire fifty percent (50%) Black and fifty percent (50%) White individuals to fill positions in the Fire Department of the Consolidated City of Jacksonville until the ratio in the Fire Department of Black employees to White employees equals the ratio of Black citizens to White citizens in the Consolidated City of Jacksonville."[1]

---

[1] Although the language of the original consent decree differed slightly, the Court amended the consent decree most recently on November 24, 1982, to include the above language.

B. *The Promotional Line of Succession*

8. Prior to the entry of the *Coffey* consent decree, certain firefighters in the City were designated as "Engineers" and were responsible for driving the fire department's pumper and ladder trucks. This status, however, did not provide for any additional benefits over other firefighters.

9. On May 13, 1987, the Union requested that the City change the promotional line of succession, so that only Engineers could be promoted to Lieutenant. Thereafter, the City's Director of Public Safety raised concerns about a potential "[a]dverse impact on blacks [and] adverse impact on the Rescue Division." No action was taken.

10. On September 28, 1987, the Union again inquired as to its request to change the promotional line of succession, so that only Engineers could be promoted to Lieutenant. This time, the City asked its own Office of Equal Employment to respond to the proposal. The City's Office of Equal Employment responded on November 8, 1987, stating:

> Per your request this office's response to the question of the I.A.F.F. proposal for revising the specification for Fire Lieutenant is an <u>absolute no</u>! We do not agree with this proposal as it would further dilute the already minute population of Blacks currently eligible for promotion from the rank of Private. . . . Current statistical review indicates the Public Safety Department to be underutilized of Blacks in the Professional category by fifty (50) persons of which the Lieutenant and higher ranks are counted (there are currently only eight blacks). In addition, the following numbers further substantiate this office's position:
>
> |           | Black | White |
> |-----------|-------|-------|
> | Privates  | 80    | 102   |
> | Engineers | 11    | 320   |
> | Total     | 91    | 422   |
>
> As you can see from the above, Blacks currently, and would continue to, have a better chance at promotion from the rank of Private. Reducing the number of eligible Blacks from 90 to 11 would be an injustice.

4

11. In early 1991, the Union again tried to add the Engineer position into the line of progression for promotion. On June 18, 1991, the City denied the request, and provided the Union with the City's Office of Equal Employment's letter dated November 8, 1987. According to the City, "the promotional situation is basically the same today and probably will not change in the foreseeable future."

12. In November 1991, the Union used the collective bargaining process to advocate and successfully push for the addition of the Engineer position into the line of progression for promotion. As a result, a firefighter was required to become an Engineer before he or she could compete for the lieutenant position, which limited the promotional opportunities for black firefighters. In addition, the majority of firefighters who had held "Engineer" status were awarded in-grade seniority points, which further limited the promotional prospects for black candidates.

C. *The Jacksonville Human Rights Commission Report*

13. On February 17, 2006, several nooses were found in the bunker gear of two black firefighters at Station 4 in Jacksonville, Florida.

14. Following this racially charged incident, in a letter dated February 21, 2006, former Jacksonville Mayor John Peyton wrote to Dr. James B. Crooks, the Chair of the Jacksonville Human Rights Commission (the "Human Rights Commission"), requesting a comprehensive investigation of the JFRD.

15. The Human Rights Commission investigated the JFRD, and "unanimously [came] to the regrettable but firm conclusion that the noose incident at Station 4, and another similar noose incident also currently under investigation by the proper authorities, are but

highly visible manifestations of broader persistent problems within the management, organization and functioning of the Department. Far too many instances of unfair or alleged discriminatory treatment grounded upon racial, ethnic and gender-based differences and disparities, and upon union affiliation or non-affiliation, occur and reoccur to be considered merely isolated incidents."

16. In addition, the Human Rights Commission found that "the range and breadth of the problem areas within JFRD is truly distressing. Clear racial differences exist in attitudes and opinions on questions of fundamental fairness in hiring, promotion and discipline; and there is acknowledgement from individuals interviewed that there is some level of racism in the department."

17. With respect to the JFRD promotional process, which consists solely of a written examination, the Human Rights Commission made the following recommendation:

> The JFRD should implement an Assessment Center, as similarly done in the Jacksonville Sheriff's Office, as part of the selection and placement of management personnel (Lieutenant, Captains, and District Chiefs). The promotional assessment process should consist of written exam, oral exam and behavior interviews and exercises to assure the best all around candidate is selected. The Assessment Center should be administered by an external agency with expertise in this area.

18. With respect to the Union, the Human Rights Commission found that "Union members, as a rule, receive more favorable or 'more equal' treatment than non-members. The line between Departmental management/leadership and the union is razor thin, if not, in practical effect, wholly obliterated." As such, the Human Rights Commission recommended that the City hire a Professional Services Evaluation Committee to review the ongoing labor relations issues that permeate the JFRD, including the Union's failure to represent all

members regardless of race and the Union's overreaching influence in the daily management of the JFRD.

## II. THE CITY'S PROMOTIONAL PROCESS

19. The Union has advocated for and negotiated in favor of a promotional process by which candidates for promotion to the position of Engineer, Lieutenant (Suppression), Captain (Suppression), and District Chief (Suppression) are promoted within the JFRD.

20. This promotional process is set forth in collective bargaining agreements ("CBA") entered into between the City and the Union. Since 2004, the relevant CBAs negotiated between the City and the Union cover the following time periods: (1) October 1, 2003, through September 30, 2005; (2) October 1, 2005, through September 30, 2008; (3) October 1, 2008, through September 30, 2009; and (4) October 1, 2009, through September 30, 2012.

21. As required by the CBAs, the line of promotion is as follows: from Firefighter, to Engineer, to Lieutenant (Suppression), to Captain (Suppression), to District Chief (Suppression). Thus, for example, in order to take the examination for Lieutenant (Suppression), candidates must have first held the position of Engineer.

22. As required by the CBAs, as part of its promotional process for the positions of Engineer, Lieutenant (Suppression), Captain (Suppression), and District Chief (Suppression), the JFRD has administered and continues to administer, either by itself or through a contractor, written promotional examinations to JFRD candidates.

23. The examinations that are administered are unique to positions sought and the department in which the position is located. As such, the promotional examinations for the

ranks of Engineer, Lieutenant (Suppression), Captain (Suppression), and District Chief (Suppression) are different from one another.

24. As required by the CBAs, the JFRD has administered and continues to administer the written promotional examinations on a pass/fail basis and to rank-order candidates for selection for promotions.

25. As required by the CBAs, the JFRD has administered and continues to administer each examination on a pass/fail basis with the pass point set at 70%. As such, only those candidates who scored 70% or higher on the written examination were eligible for consideration for promotion.

26. As required by the CBAs, the JFRD has used and continues to use the results of the written examinations as part of the rank order selection process. Thus, each JFRD candidate that passes the written promotional examination for a given rank (i.e. Lieutenant) within a department (i.e. Suppression) is given a numerical score based on the written examination results, with applicable seniority and veteran preference points added.

27. As required by the CBAs, the resulting numerical score is then used to rank-order the candidates on an eligibility list, with the person attaining the highest score ranked first.

28. As required by the CBAs, when vacancies occur, JFRD candidates for a particular rank (i.e. Lieutenant) within a department (i.e. Suppression) are selected in strict rank order as their names appear on the eligibility lists. Because of the rank order processing, only those individuals who score in the higher ranks on the written examinations are promoted.

## III. DISPARATE IMPACT

29. As set forth in more detail below, since at least 2004, the City's use of the written examinations as a pass/fail screening device with a cutoff score of 70% as required by the CBAs has resulted in a disparate impact upon black candidates for promotion to the rank of Engineer, Lieutenant (Suppression), Captain (Suppression) and District Chief (Suppression). Further, the written examinations are not job related for the positions in question and not consistent with business necessity, and they do not otherwise meet the requirements of Title VII.

30. As set forth in more detail below, since at least 2004, the City's use of rank-order processing of candidates who passed the written examinations, as required by the CBAs, has resulted in a disparate impact upon black candidates for promotion to the rank of Engineer, Lieutenant (Suppression), Captain (Suppression) and District Chief (Suppression). Further, the written examinations are not job related for the positions in question and not consistent with business necessity, and they do not otherwise meet the requirements of Title VII.

### A. *The Engineer Examinations*

31. Since 2004, consistent with the CBAs, the JFRD has administered three competitive examination processes in the screening and selection of candidates for promotion to the rank of Engineer in the JFRD. Each of these three competitive processes involved the administration of a written exam.

32. The competitive examination processes occurred on or about May 5, 2005, May 19, 2008, and June 30, 2011.

33. With respect to the 2005 written examination, the City, through the JFRD, promoted one hundred and twenty six candidates to the rank of Engineer, only six of whom are black.

34. With respect to the 2008 written examination, the City, through the JFRD, promoted ninety one candidates to the rank of Engineer, only 5 of whom are black.

35. With respect to the 2011 written examination, the City, through the JFRD, promoted approximately twenty nine candidates to the rank of Engineer, only one of whom is black.

36. The pass rate for black candidates who took the 2005 Engineer examination was statistically significantly lower than the pass rate of white candidates.

37. The pass rate for black candidates who took the 2008 Engineer examination was statistically significantly lower than the pass rate of white candidates.

38. The pass rate for black candidates who took either the 2005 or the 2008 Engineer examinations was statistically significantly lower than the pass rate of white candidates when the results of the two examinations are considered together.

39. The pass rate for black candidates who took the 2011 Engineer examination was statistically significantly lower than the pass rate of white candidates.

40. The promotion rate for black candidates who took the 2005 Engineer examination was statistically significantly lower than the promotion rate of white candidates.

41. The promotion rate for black candidates who took the 2008 Engineer examination was statistically significantly lower than the promotion rate of white candidates.

42. The promotion rate for black candidates who took either the 2005 or the 2008 Engineer examinations was statistically significantly lower than the promotion rate of white candidates when the results of the two examinations are considered together.

43. The promotion rate for black candidates who took the 2011 Engineer examination was statistically significantly lower than the promotion rate of white candidates.

44. Among those candidates who passed the 2005 Engineer exam, the promotion rate of black candidates was statistically significantly lower than the promotion rate of white candidates.

45. Among those candidates who passed the 2008 Engineer exam, the promotion rate of black candidates was statistically significantly lower than the promotion rate of white candidates.

46. Among those candidates who passed either the 2005 or the 2008 Engineer examination, the promotion rate of black candidates was statistically significantly lower than the promotion rate of white candidates when the results of the two examinations are considered together.

47. Among those candidates who passed the 2011 Engineer exam, the promotion rate of black candidates was statistically significantly lower than the promotion rate of white candidates.

48. Among those candidates who passed the 2005 Engineer exam, black candidates ranked statistically significantly lower than white candidates on the eligibility list.

49. Among those candidates who passed the 2008 Engineer exam, black candidates ranked statistically significantly lower than white candidates on the eligibility list.

50. Black candidates who passed the 2005 or the 2008 Engineer examination were ranked statistically significantly lower on the eligibility list than white candidates when the results of the examinations are considered together.

51. Among those candidates who passed the 2011 Engineer exam, black candidates ranked statistically significantly lower than white candidates on the eligibility list.

### B. *The Lieutenant (Suppression) Examinations*

52. Since 2004, consistent with the CBAs, the JFRD has administered three competitive examination processes in the screening and selection of candidates for promotion to the rank of Lieutenant (Suppression) in the JFRD. Each of these three competitive processes involved the administration of a written exam.

53. The competitive examination processes occurred on or about August 26, 2004, May 31, 2007, and April 15, 2011.

54. The City, through the JFRD, promoted ninety three candidates to the rank of Lieutenant (Suppression) based on the 2004, 2007, and 2011 Lieutenant (Suppression) examinations, only seven of whom are black.

55. Six black candidates were promoted to the position of Lieutenant (Suppression) based on the 2004 exam.

56. One black candidate was promoted to the position of Lieutenant (Suppression) based on the 2007 exam.

57. No black candidates were promoted to the position of Lieutenant (Suppression) based on the 2011 exam.

58. The pass rate for black candidates who took the 2004 Lieutenant (Suppression) examination was statistically significantly lower than the pass rate of white candidates.

59. The pass rate for black candidates who took the 2007 Lieutenant (Suppression) examination was statistically significantly lower than the pass rate of white candidates.

60. The pass rate for black candidates who took either the 2004 or the 2007 Lieutenant (Suppression) examination was statistically significantly lower than the pass rate of white candidates when the results of the examinations are considered together.

61. The promotion rate of black candidates who took either the 2004 or the 2007 Lieutenant (Suppression) examination was statistically significantly lower than the promotion rate of white candidates when the results of the examinations are considered together.

62. Black candidates who passed the Lieutenant (Suppression) examination in 2004 or 2007 were ranked statistically significantly lower on the eligibility list than white candidates when the results of the examinations are considered together.

63. The pass rate for black candidates who took the 2011 Lieutenant (Suppression) examination was statistically significantly lower than the pass rate of white candidates.

64. Among those candidates who passed the Lieutenant (Suppression) examination in 2011, black candidates were ranked statistically significantly lower on the eligibility list than white candidates.

### C. *The Captain (Suppression) Examinations*

65. Since 2004, consistent with the CBAs, JFRD has administered two competitive examination processes in the screening and selection of candidates for promotion to the rank of Captain (Suppression) in the JFRD. Each of these two competitive processes involved the administration of a written exam.

66. The competitive examination processes occurred on or about August 27, 2004, and December 11, 2008.

67. The City, through the JFRD, promoted forty nine candidates to the rank of Captain (Suppression) based on the 2004 and 2008 Captain (Suppression) examinations, one of whom is black.

68. The pass rate for black candidates who took the 2004 Captain (Suppression) examination was statistically significantly lower than the pass rate of white candidates.

69. The pass rate for black candidates who took the 2008 Captain (Suppression) examination was statistically significantly lower than the pass rate of white candidates.

70. The pass rate for black candidates who took either the 2004 or the 2008 Captain (Suppression) examination was statistically significantly lower than the pass rate of white candidates when the results of the examinations are considered together.

71. The promotion rate for black candidates who took either the 2004 or the 2008 Captain (Suppression) examination was statistically significantly lower than the promotion rate of white candidates when the results of the examinations are considered together.

72. The promotion rate for black candidates who passed either the 2004 or the 2008 Captain (Suppression) examination was statistically significantly lower than the

promotion rate of white candidates when the results of the examinations are considered together.

73. Black candidates who passed the Captain (Suppression) examination in 2004 or 2008 were ranked statistically significantly lower on the eligibility list than white candidates when the results of the examinations are considered together.

### D. *The District Chief (Suppression) Examinations*

74. Since 2004, consistent with the CBAs, the JFRD has administered two competitive examination processes in the screening and selection of candidates for promotion to the rank of District Chief (Suppression) in the JFRD. Each of these two competitive processes involved the administration of a written exam.

75. The competitive examination processes occurred on or about April 2006 and September 18, 2009.

76. Very few black candidates were eligible to take the District Chief (Suppression) examinations in 2006 and 2009 because, as alleged *supra*, the Captain (Suppression), Lieutenant (Suppression), and Engineer examinations screened out a large number of black candidates.

77. Fifteen of the test takers who took the 2006 or the 2009 District Chief (Suppression) examinations were black, and seventy of the test takers were white.

78. While black candidates were able to pass the District Chief (Suppression) examinations in 2006 and 2009, they never scored high enough to be promoted to the position of District Chief.

79. The City, through the JFRD, promoted sixteen individuals to the position of District Chief based on the 2006 and 2009 District Chief (Suppression) examinations, none of whom are black.

80. In 2006 and 2009, black candidates who passed the District Chief (Suppression) examination were ranked statistically significantly lower on the eligibility list than white candidates when the results of the examinations are considered together.

## IV. THE UNION

81. Notwithstanding the documented history of race discrimination within the JFRD, and the disparate impact of the City's promotional process specifically, the Union has advocated for, acquiesced in, and in fact negotiated in favor of the City's administration of a promotional process that has an adverse impact on black candidates.

82. Since at least 2004, notwithstanding the Union's knowledge that the City's promotional process has a disparate impact on black candidates, the Union has not advocated nor negotiated in favor of changes to the promotional process through the collective bargaining process. Rather, the Union has advocated for and negotiated in favor of the discriminatory promotional process each time a collective bargaining agreement was negotiated between 2004 and the present. The current CBAs are set to expire in September 2012.

83. Indeed, despite the history of race discrimination within the JFRD, the recommendations from the Jacksonville Human Rights Commission, the known disparate impact of the City's examination processes on black candidates, a written request by black firefighters to change the promotional process, the filing of Charges of Discrimination by

EEOC and numerous individual firefighters, and the EEOC's reasonable cause finding, the Union has repeatedly failed and refused to remedy, or even attempt to remedy, this obviously discriminatory situation. The Union has thus intentionally—or with reckless disregard—perpetuated a racially discriminatory promotional process.

84. Since at least 2004, black candidates for promotion to Engineer, Lieutenant (Suppression), Captain (Suppression), and District Chief (Suppression) have suffered damages as a result of the Union's actions and inaction.

## STATEMENT OF CLAIMS

85. Paragraphs 1 through 84 are incorporated herein. Since at least 2004, the Union has intentionally—or with reckless disregard—pursued and continues to pursue policies and practices that discriminate against blacks and that deprive or tend to deprive blacks of employment opportunities because of their race in violation of the principles of law set forth in *Howard v. International Molders & Allied Workers Union*, 779 F.2d 1546 (11th Cir. 1986) and Section 703(c)(3) of Title VII, 42 U.S.C. § 2000e-2, Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3), Section 707 of Title VII, 42 U.S.C. § 2000e-6, and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

86. The effect of the practices complained of in paragraphs 1 to 84 has been to deprive a class of black promotional candidates of equal employment opportunities and to otherwise adversely affect their status as employees because of their race.

87. The unlawful employment practices complained of in paragraphs 1 to 84 were intentionally done with malice and/or reckless indifference to the federally protected rights of the black promotional candidates.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

88. Grant a permanent injunction enjoining the Union, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in employment practices which discriminate on the basis of race. More specifically, given that the current CBAs are set to expire in September 2012, the Union shall be enjoined from advocating for inclusion in the next CBA:

> a. a promotional process that includes the Engineer position in the promotional line of succession;
>
> b. a promotional process that utilizes written examinations as a pass/fail screen for the appointment of Engineer (if included in the line of succession), Lieutenant (Suppression), Captain (Suppression), and District Chief (Suppression), where such use of the written examinations results in a disparate impact upon blacks, is not job related for the position in question and not consistent with business necessity and does not otherwise meet the requirements of Title VII;
>
> c. a promotional process that utilizes written examinations to rank-order candidates, based on the candidates' written examination scores, adjusted for seniority and veterans' preference, for the appointment of Engineer (if included in the line of succession), Lieutenant (Suppression), Captain (Suppression), and District Chief (Suppression), where such use of the written examinations results in a disparate

impact upon blacks, is not job related for the position in question and not consistent with business necessity and does not otherwise meet the requirements of Title VII;

89. Grant a permanent injunction enjoining the Union, its officers, successors, assigns and all persons in active concert or participation with it, from retaliating against black firefighters for engaging in conduct protected by Section 704(a) of Title VII, including but not limited to filing charges of discrimination and complaining of unlawful employment practices;

90. Order the Union to institute and carry out policies, practices, and programs which provide equal employment opportunities for black firefighters, and which eradicate the effects of its past and present unlawful employment practices;

91. Order the Union to pay damages to black candidates who have been denied promotions to the ranks of Engineer, Lieutenant (Suppression), and Captain (Suppression) from April 13, 2007, to the present by providing compensation for past and future non-pecuniary losses resulting from the unlawful employment practices complained of in paragraphs 1 to 84 above, including emotional and physical pain, suffering and mental anguish, in amounts to be determined at trial;

92. Order the Union to pay damages to black candidates who have been denied promotions to the ranks of Engineer, Lieutenant (Suppression), and Captain (Suppression) from April 13, 2007, to the present by providing punitive damages for the Union's malicious and reckless conduct, as described in paragraphs 1 to 84 above, in amounts to be determined at trial; and/or

93. Grant such other further relief as the Court deems necessary and proper in the public interest; and

94. Award the Commission its costs in this action.

### JURY TRIAL DEMANDED

The Commission requests a jury trial on all questions of fact raised by its complaint.

Dated: April 30, 2012

Respectfully submitted,
P. DAVID LOPEZ
General Counsel
JAMES L. LEE
Deputy General Counsel
GWENDOLYN YOUNG REAMS
Associate General Counsel
U.S. Equal Employment
Opportunity Commission
131 M Street, N.E.
Washington, D.C. 20507

ROBERT WEISBERG
Regional Attorney

KIMBERLY McCOY-CRUZ
Supervisory Trial Attorney

*Kristen M. Foslid*
KRISTEN M. FOSLID
Trial Attorney
Florida Bar No. 0688681
U.S. Equal Employment
Opportunity Commission
Miami District Office
Two South Biscayne Blvd., Suite 2700
Miami, Florida 33131
Tel: 305-808-1803
Fax: 305-808-1835
kristen.foslid@eeoc.gov